## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 09-17880-MER |
| KIP HARUKI TANI | ) | |
| POLLY ANN TANI | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| NANCY IMMEL | ) | Adversary No. 09-01507-MER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KIP HARUKI TANI | ) | Signed/Docketed |
| | ) | June 8, 2012 |
| Defendant. | ) | |

## ORDER

THIS MATTER comes before the Court on the trial on the issue of damages on Plaintiff's *Second Amended Complaint to Determine Dischargeability of Debts* (Docket No. 29) (the "Complaint") and *Default Judgment* (Docket No. 104).

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 (a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as it involves a determination as to the dischargeability of a particular debt under 11 U.S.C. § 523(a)(2)(A) and (4).[1]

---

[1] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

## PROCEDURAL BACKGROUND

This adversary proceeding has been pending since August 24, 2009, when Nancy Immel ("Plaintiff" or "Immel") filed her *Complaint to Determine Dischargeability of Debts* against both Kip Haruki Tani[2] ("Defendant" or "Tani") and his spouse, Polly Ann Tani, alleging fraud and false pretenses under § 523(a)(2)(A) and fraud and embezzlement under § 523(a)(4). The claims against Polly Ann Tani were dismissed on November 18, 2010, when the Court granted her motion for partial summary judgment. Shortly thereafter, on November 24, 2010, Defendant's counsel withdrew as attorney of record.

The Plaintiff filed numerous motions to compel the Defendant to respond to written discovery, appear at a deposition, and for sanctions against the Defendant. Specifically, on December 15, 2010, Plaintiff filed *Plaintiff's Motion to Compel Required Disclosures, to Reopen Discovery, and for Sanctions Against Defendant Kip H. Tani* (Docket No. 78). The Court granted that motion in part on January 18, 2011 (Docket No. 83). On August 19, 2011, Plaintiff filed *Plaintiff's Motion for Sanctions Against Defendant Kip H. Tani* (Docket No. 87) alleging the Defendant failed to comply with this Court's January 18, 2011 Order. On September 28, 2011, the Court conducted a hearing on the motion and entered further orders set forth in the Court's *Minutes of Proceeding* (Docket No. 93). On December 23, 2011, Plaintiff filed *Plaintiff's Motion for the Sanction of Judgment Against Defendant Kip Haruki Tani* (the "Motion for Judgment") (Docket No. 97). For the reasons stated in this Court's Order dated January 13, 2012, the Court granted the Motion for Judgment as follows:

> IT IS ORDERED Plaintiff's Motion for the Sanction of Judgment Against Defendant Kip Haruki Tani filed by Plaintiff on December 23, 2011 (Docket #97) is GRANTED.

> IT IS FURTHER ORDERED the Answers filed by Defendant Kip Haruki Tani are STRICKEN.

---

[2] The Court notes Tani identified on his bankruptcy petition the following "all other names used by the Debtor in the last 8 years": FODS Managed Investments, Inc., Former member of Coral Bay Properties, LLC, Former member of Coral Canyono Properties LLC, and FDBA Reef Ware.

IT IS FURTHER ORDERED default judgment against Kip Haruki Tani as to liability under § 523(a) shall enter.  A final judgment shall enter after the issue of damages has been decided.

IT IS FURTHER ORDERED a trial on the issue of damages only shall proceed on the previously scheduled date, namely, February 8, 2012, at 10:30 a.m. in Courtroom C-502, Byron Rogers Courthouse, 1929 Stout Street, Denver, Colorado.

(the "Default Judgment Order").

At the trial on February 8, 2012, the Court heard the testimony of Immel, E.A. Wendell Brown ("Brown") and Tani, and admitted certain of Immel's exhibits.[3]  The Court also admitted certain designated portions of the deposition transcripts of Alexander Leal ("Leal") and Stephen H. Everett ("Everett").[4]  At the conclusion of the trial, the Court ordered Immel to file, on or before February 27, 2012, her calculation of damages based on the evidence.  The Court further allowed Tani until March 8, 2012, to file a response to the damages calculation.  On February 27, 2012, Immel filed *Plaintiff Nancy Immel's Post-Trial Brief and Summary of Damages Calculations* (the

---

[3] *See Minutes of Proceeding* from February 8, 2012 (Docket No. 108).  Immel's Exhibits 1 through 10, 14 through 51, 59, 62 and 63 were admitted.  Immel's Exhibits 11, 12, 13, 52-58, and 60 were not admitted.  The Court took judicial notice of Exhibit 61, the *Complaint for Injunctive and Other Relief*, as a complaint filed in the District Court for the City and County of Denver by the Securities Commissioner for the State of Colorado against Kip H. Tani, Reefware and Coral Bay Properties, LLC, but did not take judicial notice of the contents therein or make any findings as to the truth of the allegations made in the complaint.

[4] At the conclusion of the trial, the Court ordered Tani to file any cross-designation of the portions of the depositions that the Defendant requests the Court consider, on or before Wednesday, February 15, 2012.  Tani did not file any such cross-designation.

"Summary").[5]  Tani did not file a response.  The Court, having reviewed the evidence and Summary, is now prepared to rule on the issue of damages.

## FACTUAL BACKGROUND

Immel worked as an occupational therapist for 35 years at Utah State University and then worked as a reservations clerk at a ski resort in Montana.  In late 2007, Immel moved to Ft. Collins, Colorado, to be closer to her son and his family, where she was introduced to Tani by her real estate agent.  At all times relevant to this proceeding, Tani was a licensed financial and investment advisor.  Tani acted as Immel's financial advisor beginning in January 2008, and Immel met with him at least once a week.  At the time Immel and Tani met, Immel was 61 years old, retired, not yet eligible for Social Security, and living on her savings.  Immel testified she has suffered from depression and anxiety at all times relevant to this proceeding.  Immel's counsel argued this made her particularly vulnerable to Tani's influence and investment recommendations.  Immel also testified she told Tani her goals were to be safe and secure financially, to grow her investments and to leave money to her son upon her death.

As more fully set forth below, in his position as financial advisor, Tani convinced Immel to loan money to him, his business entities, and his friends.  Further, Tani advised Immel to invest in real property in Ruskin, Florida by making loans to Leal on four separate properties.[6]  Finally, Tani advised Immel to refinance her Ft. Collins residence and to purchase a Ft. Collins rental house owned by Tani and his wife. Immel alleges all of these loans and investments were highly risky and were unsuitable investments for her, as she had just retired and was dependent on her investments for

---

[5]  On March 30, 2012, Immel filed *Plaintiff's Motion for the Court to Receive Additional Evidence in the Form of Taking Judicial Notice of the Securities Fraud Judgment Against Defendant Kip H. Tani* (Docket No. 112).  Specifically, Immel wants this Court to take judicial notice that on March 19, 2012, default judgment was entered against Tani and in favor of the Commissioner of Securities for the State of Colorado and the Colorado Attorney General.  The Court takes judicial notice of the entry of this default judgment.  However, the Court has made its own independent decisions regarding the findings of fact and conclusions of law set forth in this Opinion for purposes of the dischargeability issues before it.

[6]  Leal did not testify at the trial.  However, Leal's deposition was taken on March 30, 2010 by Immel's counsel.  *See supra* p.3.  Leal testified that he did not go to college, but had taken a mortgage broker class, a real estate class, and various armed security classes.  At the time of his deposition, Leal was 35 years old and unemployed.  Leal and Tani met in Las Vegas, Nevada in 2004 at a club where Leal was then working. as indicated above, certain portions of his deposition were designated by Immel.

income.  Immel contends Tani failed to inform her of the nature and details of the investments and the associated risks.  Immel alleges the loans and investments were procured by fraud, false pretenses, and omissions[7] under § 523(a)(2) and fraud and embezzlement while acting in a fiduciary capacity under § 523(a)(4).

## DISCUSSION

**A.**     **Elements of Claims Under § 523(a)(2)(A) and (4)**

      1.     *Section 523(a)(2)(A)*

Because the issue of damages is intertwined with the other elements under § 523(a), a review of all the elements is necessary.  Section 523(a) of the Code states in relevant part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>
> . . .
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
> >
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . .

Thus, under § 523(a)(2)(A), Immel must prove the following:

a)     Tani made a false representation;

b)     Tani made the false representation with the intent to deceive Immel;

c)     Immel relied on the representation;

d)     Immel's reliance was justifiable; and

---

[7] "The Tenth Circuit recognizes that to the extent that a debtor had a duty to disclose certain information, the non-disclosure of the information may constitute "a false representation" or "false pretenses" for purposes of § 523(a)(2)(A).  *Moses v. Seeberger* (*In re Seeberger*), 2011 WL 6749049, *20 (Bankr. N.D. Okla. 2011).

e)     Tani's representation caused Immel to sustain a loss.[8]

As explained by the United States Bankruptcy Court for the Northern District of Oklahoma, Immel must show her loss was proximately caused by her justifiable reliance on Tani's false pretenses, false representation, fraud, or omissions:

> The "obtained by" language of § 523(a)(2)(A) represents the causation element of the fraud claim-that is, the debt (for loss or damage) sought to be excepted from discharge must have been "obtained by," or proximately caused by, justifiable reliance upon the non-disclosure. *See, e.g., Ghomeshi v. Sabban* (*In re Sabban*), 600 F.3d 1219, 1223 (9th Cir. 2010). *See also Hernandez v. Musgrave* (*In re Musgrave*), 2011 WL 312883 at * *9–11 (BAP 10th Cir., Feb. 2, 2011) (explaining proximate cause as a "direct link" between the misrepresentation and the debt sought to be excepted from discharge, *i.e.*, the misrepresentation must be a "'substantial factor in determining the course of conduct that results in [the] loss'" and the loss must be "'reasonably . . . expected to result from the reliance'," *quoting* Restatement (Second) of Torts §§ 546 and 548A, respectively, and concluding that the damages claimed by the creditor were not proximately caused by the misrepresentation).[9]

---

[8]  *See Fowler Brothers v. Young* (*In re Young*), 91 F.3d 1367, 1373 (10th Cir. 1996) and *Field v. Mans*, 516 U.S. 59, 74 (1995).  As noted by Chief Judge Howard R. Tallman of this Court,

The *Fowler Bros.* Court used the term "reasonable" reliance, but the Supreme Court has held that § 523(a)(2)(A) requires justifiable, and not reasonable, reliance in the case of *Field v. Mans*, 516 U.S. 59, 74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). This Court will apply that standard rather than the reasonable reliance standard articulated in *Fowler Bros. v. Young*. In order for the Plaintiff to have justifiable reliance on a representation under 11 U.S.C. § 523(a)(2)(A), the Plaintiff need only perform a cursory inspection of the representation to the extent that it should be very obvious that the representation is fraudulent. *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance is not reasonable reliance, so the objective reasonable person standard does not apply; it is merely what a cursory examination of the representation would uncover. *Id.* at 72, 116 S.Ct. 437.

*In re Sutherland-Minor*, 345 B.R. 348, 354, n.4 (Bankr. D. Colo. 2006).

[9]  *In re Seeberger*, 2011 WL 6749049, *21 (Bankr. N.D. Okla. 2011).  *See Sanchez v. Lovato* (*In re Lovato*), 442 B.R. 810, 816 (Bankr. D. N.M. 2011) ("*Bastian* and the other authorities cited above show

2.    *Section 523(a)(4)*

Section 523(a)(4) provides: "(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. . . ."  Federal law limits the application of § 523(a)(4) to express and technical trusts, and debts alleged to be nondischargeable must arise from breach of trust obligations imposed by law, separate and distinct from any breach of contract.[10]  Courts have found a debtor's status as a financial advisor to fall within § 523(a)(4)'s "fiduciary capacity" requirement.[11]  In order to obtain a judgment of nondischargeability under § 523(a)(4) a creditor must show (1) the existence of a fiduciary relationship between the debtor and the plaintiff, and (2) a defalcation committed by the debtor in the course of that fiduciary relationship.[12]

---

that a Plaintiff must demonstrate a direct link between the misrepresentation and the actual damages suffered.  'But for' causation alone is not enough.").  *See also Woodstock Housing Corporation v. Johnson* (*In re Johnson*), 242 B.R. 283, 292 (Bankr. E.D. Pa. 1999) stating as follows:

> As *Field* teaches, § 523(a)(2) requirements must be determined under common law tort principles.  For this reason, a damage requirement is uniformly read into § 523(a)(2)(A), even though no express inclusion of such a requirement appears in the text of that Code section.  We attribute the presence of the requirement that "resulting injury" proximately caused by alleged fraudulent conduct is included as a requirement in a § 523(a)(2)(A) claim to the fact that this is an element which is necessary for the proof of common law fraud generally.

[10]  *Fowler & Peth, Inc. v. Regan (In re Regan)*, 311 B.R. 271, 275 (Bankr. D. Colo. 2004); *Anderson v. Currin (In re Currin)*, 55 B.R. 928, 932 (Bankr. D. Colo. 1985).

[11]  *See Griffiths et al. v. Peterson (In re Peterson)*, 96 B.R. 314, 323-324 (Bankr. D. Colo. 1988); *Jacobs v. Mones (In re Mones)*, 169 B.R. 246, 255–56 (Bankr. D. Colo. 1994).  *See also Bucl et al. v. Hampton (In re Hampton)*, 407 B.R. 443 at *4 (10th Cir. BAP 2009) (unpublished decision) (recognizing that "[s]ome courts have held that an investment advisor may be considered a fiduciary for purposes of § 523(a)(4)," but that "[t]hese cases are very fact specific and generally involve a debtor that had clear management and control over a creditor's monies.").

[12]  *Fowler Brothers, supra,* at 1371;  *Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 286 (10th Cir. BAP 1997).

**B.    Assessment of Damages Under Sections 523(a)(2)(A) and (a)(4)**

    *1.    Measure of Damages*

       The damages sought in this case arise from two categories of transactions.  The first consists of loans made by Immel to Tani or his business entities and friends, including ReefWare, Coral Bay Properties, LLC, Pam Stoney and Mark Pugh.  The second consists of real estate investments Immel made in Ft. Collins, Colorado and Ruskin, Florida.  The damages related to the real property in Ruskin, Florida are based primarily on loans made by Immel to Leal, which were arranged through Tani.

      *a.    Liability for Loans Involving Third Parties*

       Certain of the loans and investments discussed below were not made directly from Immel to Tani.  Immel argues Tani is liable for her losses on the loans made to third parties under two theories.  First, Immel argues liability through Tani's fraudulent acts and violations of the rules and regulations of Financial Industry Regulatory Authority ("FINRA").  Second, she asserts Tani benefitted directly (in the case of the loans to Reefware and Coral Bay Properties, LLC, the refinance of 504 Corbett Drive, and the purchase of 518 North Whitcomb) and indirectly (in the case of the loans to Pam Stoney, Mark Pugh, and Leal) by way of fees, including loan origination fees.[13]  To the extent damages are proven, the Court agrees with Immel that Tani is liable for damages based on the loans and investments including third parties.  In denying a defendant's motion for summary judgment, the Honorable A. Bruce Campbell of this Court explained this theory of liability:

       Though the underlying notes are clearly obligations of JOAD, Plaintiffs do not claim Defendant is liable on the notes. They allege that Defendant caused them damages by inducing them, through fraud, to invest money in JOAD. They seek damages for money they lost as a result of Defendant's personal fraud.  It is not necessary to pierce the corporate veil in this circumstance, nor to prove that Defendant received any direct benefit as a result of his fraud.  *See, Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998) (§ 523(a)(2)

---

    [13]  Leal testified at his deposition Tani was paid a fee (documented as a loan origination fee) for obtaining the financing for the Ruskin, Florida construction projects.  Leal Depo. at 18: 9-13, March 30, 2010.

encompasses any debt resulting from fraud); *Nat'l Development Svcs, Inc. v. Denbleyker* (*In re Denbleyker*), 251 B.R. 891 (Bankr. D. Colo. 2000) (debt for money obtained for debtor's corporation as a result of debtor's fraud is nondischargeable under § 523(a)(2)).[14]

---

[14] *Newman et al. v. Donnell* (*In re Donnell*), 2011 WL 2294186, *3 (Bankr. D. Colo. 2011).  *See National Development Services, Inc. v. Denbleyker* (*In re Denbleyker*), 251 B.R. 891,898-899 (Bankr. D. Colo. 2000) (discussing *Cohen v. de la Cruz*, 523 U.S. 213 (1998) and *Field v. Mans*, 516 U.S. 59 (1995)):

> The *Cohen* decision implies that § 523(a)(2)(A) prevents the discharge of all liabilities arising from a debtor's fraud, regardless of whether the plaintiff proves that the debtor benefitted in any way.  Accordingly, this Court holds that once a plaintiff establishes the elements set forth in *Field v. Mans, supra, i.e.*, that the debtor obtained money or property by fraud, any debt arising from the fraud is excepted from discharge.

Similarly, in denying a defendant's request to limit the plaintiff's recovery to the amount of the commissions, the United States Bankruptcy Court for the District of Columbia stated:

> The requirement that the debtor benefit from the money obtained by fraud only affects the issue of the statute's applicability.  However, there is no suggestion that a debt for money obtained by fraud should be nondischargeable only to the extent of the benefit received.  Rather, upon finding a benefit, the entire debt resulting from the defendant's fraudulent actions is nondischargeable.

*Jacobs v. Mones* (*In re Mones*), 169 B.R. 246, 255–56 (Bankr. D. Dist. Col.1994).

b.     Measuring Damages on Funds Procured by Fraudulent
Inducement[15]

The proper measure of damages within the § 523 context has been reviewed at
length in several opinions in the case of *In re Mascio*.[16]  In *Mascio*, with respect to the
proper measure of damages regarding loans, the United States District Court for the
District of Colorado (the "District Court") stated, "[i]n cases of fraudulent inducement in
procuring a loan, 'the proper measure of damages is the total amount of money loaned,
plus interest.'"[17] The District Court explained:

The Colorado Supreme Court provides as follows with regard to determining
damages for fraudulent inducement:

A plaintiff who has been fraudulently induced to enter a contract may
either rescind the contract or affirm the contract and recover in tort for
the damages caused by the fraudulent act.  The plaintiff has the
burden of proof and must establish by a preponderance of the
evidence that he has in fact suffered damage and that the evidence
introduced provides a reasonable basis for a computation of
damages.  Where the subject of a fraud is a conveyance of property,

---

[15] Although somewhat inartfully pled, Immel's fraud claim under § 523(a)(2) relates to fraud in the
inducement. Specifically, although the Amended Complaint, filed January 29, 2010, at Docket No 29,
does not use the word "inducement," the factual allegations all use the terms "convinced", "fraudulently
convinced," and "persuaded," which function as equivalents of "inducement."  See Amended Complaint,
¶¶ 11–22.  The first claim for relief ("Fraud and False Pretenses, § 523(a)(2)") contains statements that
Tani knowingly or recklessly engaged in acts "which operated as a fraud and deceit" upon Immel, and
knowingly made misrepresentations to Immel, and uses the words "fraudulently convinced with respect to
Immel's purchase of Tani's rental property.  Amended Complaint, ¶ 28.  The Second Claim for Relief,
("Fraud and Embezzlement While Acting in a Fiduciary Capacity § 523(a)(4)") contains only statements
relating to the Tani's fiduciary relationship to Immel because he was her financial advisor.  Therefore, the
Court finds the Amended Complaint sets forth fraud in the inducement (convincing Immel to make
inappropriate investments and loans), as opposed to other facets of fraud (such as using fraudulent
statements to prevent Immel from taking action, or submitting falsified financial statements, etc.).

[16] *Gronewoller v. Mascio* (*In re Mascio*), 2007 WL 3407516 (D. Colo. 2007).

[17] Id. at *7 (citing *Black v. First Fed. Savings & Loan Ass'n*, 830 P.2d 1103, 1114 (Colo. App.
1992), aff'd on other grounds sub nom., *La Plata Med. Ctr. Assocs. v. United Bank*, 857 P.2d 410 (Colo.
1993)).

a plaintiff electing to affirm the contract is entitled to receive the benefit of the bargain, *i.e.*, the difference between the value of the property as represented and the actual value of the property as received. An essential element of such an award is actual damage. This damage cannot be based on mere speculation or conjecture, but once the fact of damage has been established with the requisite degree of certainty, uncertainty as to the amount of damages will not bar recovery.

*W. Cities Broadcasting, Inc. v. Schueller*, 849 P.2d 44, 48 (Colo. 1993) (citations and quotations omitted).[18]

With respect to property regarding which fraud or misrepresentation has been shown, the District Court further stated in a later *Mascio* appeal:

Under Colorado law, [the plaintiff] is entitled to receive "the difference between the actual value of the property *at the time of purchase* and its value at that time had the representation been true.". . . Under Colorado law, values prior to or subsequent to the date of payment <u>are irrelevant</u>.[19]

2.     *Plaintiff's Damages Based on Loans*

As supported by the facts set forth above and below, Immel has proven Tani induced her to make loans that were not properly suited for her, and (although not necessary to prove) clearly benefitted Tani, which resulted in significant losses to her.

---

[18]  *Id.* at *6.

[19]  *Mascio v. Gronewoller* (*In re Mascio*),  454 B.R. 146 (D. Colo. 2011) (emphasis added). Further, the District Court stated:

Under Colorado law, "the measure of damages in [fraud] cases is the 'benefit of the bargain' rule, designed to give a plaintiff his or her expectation interest for loss of bargain." *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 677 n. 5 (Colo. 1994). Thus, a plaintiff is entitled to receive "the difference between the actual value of the property and what its value would have been had the representation been true." *Otis & Co. v. Grimes*, 97 Colo. 219, 48 P.2d 788, 791 (1935).

*Id.* at 150 n.4.

Although each individual transaction may not, standing on its own, result in a finding the debt is nondischargeable under § 523(a), the pattern and duration of Tani's fraud convinces this Court all of the losses resulting from the loans are nondischargeable. Tani induced Immel into making these loans by way of false pretenses, false representations, concealment and omission of material information, and actual fraud.[20] The Court finds Tani essentially used Immel as his personal bank account to make loans and pay fees to his own business entities, as well as to make loans to his friends and acquaintances.  As mandated by the District Court in *Mascio*, and discussed above, the proper measure of damages for the loans is the total amount of money loaned, plus interest.[21]

      a.     <u>Loan to Kip Tani d/b/a ReefWare</u>

Immel testified she made a loan to Tani, d/b/a ReefWare, based upon Tani's recommendation.   She seeks $8,000.00 in damages based on this loan.  Immel's handwritten notes in Exhibit 46 (a ledger sheet) indicate she made a loan on February 21, 2008, in the amount of $8,000, with the principal due on February 21, 2010. Further, her notes show she received interest payments of $160 on April 15, 2008 (for March and April), $160 on June 10, 2008 (for May and June), $80 on July 31, 2008 (for July), and $160 on January 2, 2008 (for November and December).

The Court agrees with Immel and awards her the $8,000.00 in damages requested on this loan.

---

[20]  The Court's findings and conclusions are also supported by the testimony of Stephen H. Everett ("Everett").  Although he did not testify at trial, Immel designated certain portions of the deposition of Everett, who appeared as the representative of Multi-Financial Securities Corp. ("MFSC").  *See supra* p.3; *see also* Everett Depo. July 7, 2010.  Everett testified regarding Immel's account with MFSC which was opened in June 2008.  Tani worked for MFSC in 2008 and his name and handwriting appears on the paperwork in Immel's MFSC file.  Everett was unaware that Tani was serving as Immel's financial advisor prior to June 2008.  Effective January 22, 2009, Tani was terminated from MFSC for unapproved outside business activities, including arranging loans between clients and a Florida developer and soliciting investments for his own companies.  Everett Depo. at 22:18 - 24:5.

[21]  *Mascio, supra,* 2007 WL 3407516 at *7.

      b.    <u>Loan to Kip Tani d/b/a Coral Bay Properties, LLC</u>

On April 25, 2008, Immel wrote a check to Coral Bay Properties, LLC for $2,800.00 which she understood was for Alexander Leal and the Florida properties.[22] On September 20, 2008, Immel made a loan of $25,000.00 to Coral Bay Properties, LLC.[23]  Immel directs the Court to Exhibit 48 which is a check from Coral Bay Properties, LLC (signed by Tani)  to Immel as a payment on the loan.  The check (sent by Tani's prior counsel to Immel's counsel) is dated July 13, 2009 in the amount of $10,183.34.  Immel seeks $16,862.28 in damages on the loans she made to Tani, d/b/a Coral Bay Properties, LLC.[24]

The Court agrees with Immel and awards her the $16,862.28 in damages requested on this loan.

      c.    <u>Loan to Pam Stoney</u>

On February 21, 2008, Tani convinced Immel to make an unsecured loan in the amount of $7,000.00 to a person named Pam Stoney.  Specifically, Immel testified she made the loan based on Tani's request because Pam Stoney was in financial distress over a law suit.  The loan was evidenced by a promissory note date February 21, 2008, in the amount of $7,000.00 with an annual interest rate of 12% and a default interest rate of 18% (the "Stoney Note").[25]  Although the Stoney Note identifies the collateral as "2nd deed of trust to be filed if necessary," Immel testified she never took steps to secure the Stoney Note.  The Stoney Note states it was due and payable on December

---

[22]  Exhibit 51 is a copy of check no. 2546 dated April 25, 2008, for $2,800.00 from Immel to Coral Bay Properties with the "memo line" reading "Leal properties."

[23]  Exhibit 47 is a promissory note between Immel (as "Maker") and Coral Bay Properties, LLC (as "Payee") dated September 20, 2008 in the principal amount of $25,000.00 with an annual interest rate of 10% and a default interest rate of 18%.  The Note is signed by Kip Tani as Manager of Coral Bay Properties, LLC.

[24]  The Court is unclear exactly how Immel computed her damages calculation in connection with this loan.  Adding the loan to the $2800 check equals $27,800.  After deducting the check dated July 13, 2009 leave a potential claim of $17,616.66.  Immel in her pleadings seeks the sum of $16,862.28.  The Court will assume Immel's calculations are correct.

[25]  Exhibit 1.

31, 2008, and "This note has a $150 origination fee and may be paid off early at the discretion of the payee [Pam Stoney]."[26]

Immel received $70 per month in interest for a brief period of time; however the interest payments stopped by mid-2009. Although Immel attempted collections on her own and through her counsel, she has not received any principal back from the loan to Pam Stoney. Immel seeks $7,000.00 in damages based on the loan to Pam Stoney.

The Court agrees with Immel and awards her the $7,000.00 in damages requested on this loan.

      d.   Loan to Mark Pugh

On April 29, 2008, Tani convinced Immel to make an unsecured loan in the amount of $5,000.00 to Mark Pugh. This loan is evidenced by a check written by Immel to Mark Pugh on April 9, 2008 in the amount of $5,000.[27] Immel testified she made this loan because Tani suggested she do so. She recalled it had something to do with one of Tani's other businesses. Immel never met Mark Pugh and did not receive a note or any security documents from Mark Pugh.

Immel received one interest payment from Coral Bay Properties, LLC, apparently on behalf of Mark Pugh, evidenced by a check dated October 2, 2008, from Coral Bay Properties, LLC to Immel for $130.00.[28] After collection efforts by Immel and her attorney, this loan was paid. Immel directs the Court to a cashiers' check dated October 12, 2009, from First National Bank to Immel for $5,517.00.[29] Immel testified this check was from Mark Pugh to pay off the loan and that it included interest. Immel agreed to pay her attorney, Robert McKnight 1/3 of what he collected, so McKnight

---

[26] Exhibit 1, p. 1.

[27] Exhibit 25.

[28] Exhibit 26 is a check dated October 2, 2008 from Coral Bay Properties, LLC (signed by Kip Tani) to Immel in the amount of $130.00. Immel testified the barely legible "memo line" states the payment is for the $5,000 loan to Mark Pugh, and thus she believed this payment to be an interest payment on that loan.

[29] Exhibit 27.

received 1/3 of the $5,517.00.  Thus, Immel seeks $1,839.00 in damages (collection costs) based on this loan.

The Court agrees with Immel and awards her the $1,839.00 requested on this loan.

      e.     <u>Mortgage on 504 Corbett Drive, Fort Collins, Colorado</u>

Although the damages from the mortgage on Immel's residence involved real property, the Court finds they should be considered as damages based on loans, because the mortgage was obtained for making loans to Tani, not for payment to others on Tani's recommended real property investments.  Immel alleges Tani fraudulently convinced her to refinance the home she had just purchased at 504 Corbett Drive to take equity out for investment purposes, including loaning money to Tani and to purchase a rental property from Mr. and Mrs. Tani (the 518 N. Whitcomb property discussed below).  Everett testified it "is not permissible [under Multi-Financial policy] to recommend to a client to take out a mortgage to invest in investment securities. . . .  I cannot tell you to mortgage your house and invest in mutual funds, for example."[30]

After she obtained the mortgage on the home, she had mortgage payments of approximately $1,600 per month.  Immel testified she later had to sell the Corbett Drive house because she could not afford to live and make the $1,600/month mortgage payment while her other money was tied up in investments recommended by Tani.

Immel bases her claim related to this mortgage on the following items: 1) purchase price and closing costs paid on February 26, 2008, in the amount of $280,690.54 (Exhibit 41); 2) loan mortgage settlement charges paid on July 30, 2008, in the amount of $3,515.39 (Exhibit 42); 3) interest paid on the mortgage through 2008 in the amount of $5,058.18 (Exhibit 43); 4) interest paid on the mortgage through October 2009 in the amount of $12,629.40 (Exhibit 43); and 5) closing costs paid on October 30, 2009 on sale (excluding payoff of mortgage and taxes) in the amount of $17,741.96 (Exhibit 45).  Based on these five items, the aggregate costs claimed are $319,635.47.

---

[30]  Everett Depo. 38-1:9, July 7, 2010.

Immel acknowledges these costs must be reduced by the sale price on October 4, 2009, of $281,900.00 (Exhibit 45), resulting in total damages claimed of $37,735.47. The Court agrees with Immel and awards her the $37,735.47 requested on this loan.

Thus, Immel's damages based on loans equal $71,436.75, plus prejudgment interest at the Colorado statutory rate of 8%,[31] compounded annually, through May 30, 2012, for a total of $93,029.66.

### 3.     Plaintiff's Damages Based on Real Property Investments

As mandated by the District Court in *Mascio*, and discussed above, the proper measure of damages is the difference between the actual value of the property at the time of purchase and its value at that time had the representation been true. Values subsequent to the date of payment are irrelevant.[32]

### a.     House at 504 B 5th SE Avenue, Ruskin, Florida

With respect to this, and the other Florida properties discussed below, Immel testified in 2008 Tani recommended she invest in residential real estate in Florida. Immel invested based on Tani's recommendation it would be a good and appropriate investment for her.[33] Prior to investing, Immel flew to Florida to see some properties and lots, and to meet the contractor, Leal. Although the loans were made by Immel to Leal, Immel testified all of her dealings were with Tani.[34] Immel testified Tani did not tell

---

[31]  See COLO. REV. STAT. § 5-12-102(1).

[32]  *Mascio*, *supra*, 454 B.R. 146 at 150 n.4.

[33]  Although Leal's father had over 40 years of construction experience, prior to Immel's real estate investment in the 504 A and B 5th SE Avenue properties, Leal himself had only done one other real estate project at 606 and 608 4th SE Avenue in Ruskin, Florida involving Tani's client, E.A. Brown, LLC.  Leal Depo., p.10:1 - p.11:25, March 30, 2010.

[34]  Leal's deposition testimony is consistent with this.  He stated, "I had no way of communicating with the Browns or Nancy.  I didn't have any phone numbers or addresses or anything like that.  My direct communication was with Kip [Tani] all the time."  Leal Depo. at 13: 15-18, March 30, 2010.  He also stated, "I had no contact whatsoever with the investors other than the time that Nancy came to visit that one time.  We never really exchanged contact information.  She dealt with Kip, I dealt with Kip.  I had no contact with the investors."  Leal Depo. at 26:19-23.

her that the housing market and mortgage market were beginning to decline in early 2008.

Immel bases the claim regarding 504 B 5th SE Avenue on the following: 1) loans to Alexander Leal, beginning on February 12, 2008, in the total amount of $165,000.00 (Exhibits 2, 3, 4, 7, and 23);[35] 2) Hillsborough County taxes for 2008 in the amount of $551.29 (Exhibit 5); 3) Hillsborough County taxes for 2009 in the amount of $551.29 (Exhibit 5); 4) Hillsborough County taxes for 2010 in the amount of $1,015.50 (Exhibit 8); 5) Hillsborough County taxes for 2011 in the amount of $1,015.50 (Exhibit 8); and 6) construction costs paid to Evergreen Contracting, LLC to complete the house in the amount of $16,623.71 (Exhibit 9).[36]  Based on these six items, total costs claimed are $184,757.29.  Although Immel received some interest payments on this loan in 2008, she testified Leal stopped making interest payments in 2009.  Immel testified she attempt to get Leal to pay off the loan by talking to Tani about it, but Tani indicated he did not know why the loan was not being paid off.  Immel testified the properties were presented as a group.  Immel testified the first couple of months went well, as she was sending them the money and they were sending her the interest.

---

[35] Exhibit 2 is a Settlement Statement dated February 12, 2008, between Alexander Leal (as "Borrower") and Vian Properties, LLC (as "Seller") showing the gross amount due from Leal is $140,000.00 to purchase the property at 504 B 5th SE Avenue, Ruskin, Florida.  Page 2 of the Settlement Statement shows a "Loan origination fee" of $3,400.00, a "Processing fee" of $300.00, and a "LIP Account" of $101,300.00 all payable to First National Mortgage Source.  Leal testified that Tani either owned or worked for First National Mortgage Source.  Leal Depo. 20:14 - 21:3.  Exhibit 3 contains:  1) a Mortgage Note dated February 12, 2008, in the amount of $140,000.00 between Nancy Immel (as the "note holder" and "payee") and Alexander Leal (as the "maker") and 2) a Mortgage Deed dated February 12, 2008, between Nancy Immel (as "mortgagee") and Alexander Leal (as the "mortgagor").  Exhibit 4 contains a Foreclosure Report dated October 2, 2009, including a list of all encumbrances.  Exhibit 7 is the font and back of a check written by Immel to Leal on March 13, 2008, in the amount of $26,300.00 with a "memo" line of "2nd draw."  Immel further testified this was the second draw.  Exhibit 23, handwritten accounting notes of Leal, indicates Immel advanced four draws on 504 B 5th SE Avenue totaling $165,000: 1) $26,300;(2) $25,000; 3) $25,000; and 4) $50,000.  Leal testified he did not received the initial $140,000.00 loan all at once, but that the loan was set up as a "draw structure."  Leal Depo. 22:16-25, March 30, 2010.  With regard to the last $50,000 draw, Leal testified, "I explained to Kip again, if [Immel is] tapped out broke, I don't want to take her last $50,000."  Leal Depo. at 33: 22-24.  Leal also confirmed Immel put $165,000 into the 504B house.  Leal Depo. at 35: 4-6.

[36] Based on the Evergreen Contracting LLC statement dated January 12, 2012, it appears Immel made several payments on the $16,623.71 total cost, leaving a remaining balance of $1,773.78 due to Evergreen Contracting, LLC.  Immel testified she had to complete construction of the house in order to sell it.

On or about December 12, 2011, the house at 504 B 5th SE Avenue was sold for a contract sales price of $80,000.00, and Immel received $74,126.22 in proceeds.[37] Immel acknowledges certain reductions from her cost claim must be made for: 1) interest received in 2008 in the amount of $2,930.00 (Exhibit 4); and 2) the net sale proceeds in the amount of $74,126.22 (Exhibit 10). Based on these two items, total reductions are $77,056.22. Thus, Immel seeks total damages of $107,701.07 for her investment in the house at 504 B 5th SE Avenue, Ruskin, Florida.

With respect to property, under *Mascio*, the Court may only award the difference between the actual value of the property at the time of purchase and its value at that time had the representation been true. The "loss ratio" calculation offered by Immel does not meet this standard. The Court has no evidence of the actual value of the property at the time of Immel's investment, nor of the actual value of the property had Tani's (or Leal's) assertions about the property been true. Further, although Immel paid taxes and construction completion costs, these elements are not part of the value difference on the date of payment, as required by *Mascio*.[38] Accordingly, the Court can award no damages with respect to this property.

---

[37] Exhibit 10.

[38] Specifically, the *Mascio* Court stated:

Under Colorado law, [a plaintiff] is entitled to receive "the difference between the actual value of the property *at the time of purchase* and its value at that time had the representation been true." *Colorado Performance Corp. v. Mariposa Assoc's.*, 754 P. 2d 401, 408 (Colo. App. 1987) (quoting *Wagner v. Dan Unfug Motors, Inc.*, 529 P. 2d 656, 657 (Colo. App. 1974) (emphasis in original); *Estate of Korf v. A. O. Smith Harvestore Products, Inc.*, 917 F. 2d 480, 483 (10th Cir. 1990) (applying Colorado law). In the damage calculation, the Bankruptcy Court averaged all of the represented value estimates testified to by [the plaintiff] without filtering the evidence so that it pertained only to the represented value at the "time of purchase." Under Colorado law, values prior to or subsequent to the date of payment are irrelevant.

*Mascio, supra*, 454 B.R. at 154.

    b.    <u>House at 504 A 5th SE Avenue, Ruskin, Florida</u>

Immel bases this claim on loans she made to Leal, beginning on December 12, 2008, in the total amount of $50,000 (Exhibits 14, 23 and 59).[39]  Immel anticipates her loss will be $29,145.00[40] because this property has not yet been sold, assuming the same loss ratio on this property as on the house at 504 B 5th SE Avenue.  Thus, Immel is seeking to recover $29,145.00 as damages for her investment in the house at 504 A 5th Avenue, Ruskin, Florida.

With respect to property, the Court, under *Mascio*, can only award the difference between the actual value of the property at the time of purchase and its value at that time had the representation been true.  The "loss ratio" calculation offered by Immel does not meet this standard.  The Court has no evidence of the actual value of the property at the time of Immel's investment, nor of the actual value of the property had Tani's (or Leal's) assertions about the property been true.  Accordingly, no damages can be awarded on this property.

---

[39]  Exhibit 14 is an Agreement For Transfer of Title to and Sale of Realty, dated January 22, 2011, between Wendell E. Brown, Alise Brown and EA Brown, LLC (the "Browns") and Nancy Immel.  The Agreement indicated the Browns initially anticipated making loans totaling $140,000.00 to Alexander and Antonette Leal (the "Leals") for the purchase and construction of a house at 504 A SE 5th Avenue.  The Browns were only able to make loans to the Leals totaling $65,000.00 and Immel attempted to achieve the completion of the construction by investing $50,000.00 into the property by making loans to the Leals.  Thus, the Browns agreed to convey title to the property to Immel as a tenant in common, with the Browns holding a 56% interest and Immel holding an undivided 44% interest.  Exhibit 23, handwritten accounting notes of Leal, confirms the Browns invested $65,000.00 and Immel invested $50,000.00.  Exhibit 59 is a "Wells Fargo PMA Package" statement for Immel's Wells Fargo account dated December 31, 2008, showing the $50,000.00 withdrawal from Immel's account to Leal's Bank of America account.  Immel testified she wired $50,000 to Leal with the understanding it was a loan to help Mr. and Mrs. Brown on the 504A 5th Ave. house.  Leal also confirmed Immel put $50,000 into the 504A house.  Leal Depo. 35: 7-9, March 30, 2010.

[40]  In her Summary, Immel states, "Estimated value or sales price - based on the percentage of the net sale price on the property at 504 B. 5th Avenue, Ruskin, FL.  On the 504 B 5th Avenue property, Plaintiff invested $184,757.29, and received a net sales price of $74,126.22 (Exhibit 10), for a loss of $107,701.07, or 58.29 percent of her investment.  Assuming the same loss ratio on this property, Plaintiff's reasonably anticipated loss will be $50,000.00 x 58.29, or $29,145.00."  Summary, p. 3.

c.    Property at Parcel A 0 4th (North 1/2) SE Avenue, Ruskin, Florida

Immel bases her claim on "Parcel A" on the following:  1) loans she made to Leal, beginning on April 24, 2008, in the total amount of $64,025.00 (Exhibits 15, 16, 17 and 23);[41] 2) Hillsborough County taxes for 2008 in the amount of $1,083.37 (Exhibit 50, page 1); 3) Hillsborough County taxes for 2009 in the amount of $553.59 (Exhibit 50, page 2); 4) Hillsborough County taxes for 2010 in the amount of $223.91 (Exhibit 50, page 3); and 5) other Hillsborough County tax charges paid in the amount of $8.35 (Exhibit 50, page 1).  Based on these five items, total costs claimed are $65,894.54.

Immel testified she did not receive any interest payments toward the loans in connection with this property and the loan has not been satisfied.  Further, the house remains unfinished nor has it been sold.[42]  Immel anticipates her loss will be $38,409.27[43] because this property has not yet been sold, assuming the same loss ratio on this property as on the house at 504 B 5th SE Avenue.  Thus, Immel is seeking to recover $38,409.27 as damages for her investment in the property at Parcel A 0 4th (North 1/2) SE Avenue, Ruskin, Florida.

---

[41]  Exhibit 15 is an unsigned  Settlement Statement regarding the property at 0 4th Avenue, Ruskin, Florida, dated April 24, 2008, showing the gross amount due from Leal is $28,026.13, the principal amount of a new loan of $38,700.00, resulting in $10,673.87 in cash to Leal.  The settlement charges include a "loan origination fee" of $3,400 to Immel and a "processing fee" of $300 to Coral Bay Properties (one of Tani's business entities).  Exhibit 16 is a Mortgage Note dated April 24, 2008 between Immel (as "Payee") and Leal (as "Maker") wherein Leal agreed to pay Immel $38,700.00.   Exhibit 16 also contains a Mortgage Deed, dated April 24, 2008, between Leal and Immel to secure the Mortgage Note.  Exhibit 17 is a Foreclosure Report dated October 2, 2009, including a list of all encumbrances.  The report was obtained by the law firm Immel hired in Florida - Golson Legal, P.A.  Exhibit 23, handwritten accounting notes of Leal, shows Immel advanced two draws on this property totaling $64,025.00 - - the first for $38,700 on April 24, 2008, and the second for $25,325 on August 7, 2008.  Leal confirmed Immel invested $64,025.00 in each house on 4th Ave.  Leal Depo. 35:19-22, March 30, 2010.

[42]  Exhibit 21 contains pictures of Parcel A and B showing the unfinished homes and overgrown landscape.

[43]  In her Summary, Immel states, "Estimated value or sales price - based on the percentage of the net sale price on the property at 504 B. 5th Avenue, Ruskin, FL.  On the 504 B 5th Avenue property, Plaintiff invested $184,757.29, and received a net sales price of $74,126.22 (Exhibit 10), for a loss of $107,701.07, or 58.29 percent of her investment.  Assuming the same loss ratio on this property, Plaintiff's reasonably anticipated loss will be $65,894.54 x 58.29, or $38,409.27.00."  Summary, p. 4.

With respect to property, the Court, under *Mascio*, can only award the difference between the actual value of the property at the time of purchase and its value at that time had the representation been true. The "loss ratio" calculation offered by Immel does not meet this standard. The Court has no evidence of the actual value of the property at the time of Immel's investment, nor of the actual value of the property had Tani's (or Leal's) assertions about the property been true. Therefore, the Court can award no damages regarding this property.

      d.    <u>Property at Parcel B 0 4th (south 1/2) SE Avenue, Ruskin, Florida</u>

Immel bases this claim on "Parcel B" on the following: 1) loans she made to Leal, beginning on April 24, 2008, in the total amount of $64,025.00 (Exhibits 18, 19, 20, and 23);[44] 2) Hillsborough County taxes for 2008 in the amount of $1,083.37 (Exhibit 49, page 1); 3) Hillsborough County taxes for 2009 in the amount of $553.59 (Exhibit 49, page 2); 4) Hillsborough County taxes for 2010 in the amount of $223.91 (Exhibit 49, page 3); and 5) other Hillsborough County tax charges paid in the amount of $8.35 (Exhibit 49, page 1). Based on these five items, total costs claimed are $65,894.54.

Like the Parcel A property, Immel testified the loan on Parcel B has not been paid and the house has not been completed or sold.[45] Because this property has not yet been sold, assuming the same loss ratio on this property as on the house at 504 B

---

[44] Exhibit 18 is a Settlement Statement dated April 24, 2008 regarding the property at 0 4th Ave., Ruskin, Florida identifying Leal as the borrower and Immel as the lender. It shows the gross amount due from Leal is $28,026.13, the principal amount of the new loan from Immel is $38,700.00, resulting in $10,673.87 in cash to Leal. The settlement charges include a "loan origination fee" of $3,400 to Immel and a "processing fee" of $300 to Coral Bay Properties. Exhibit 19 is a Mortgage Note dated April 24, 2008 between Immel (as "Payee") and Leal (as "Maker") wherein Leal agreed to pay Immel $38,700.00. Exhibit 19 also contains a Mortgage Deed, dated April 24, 2008, between Leal and Immel to secure the Mortgage Note. Exhibit 20 is a Foreclosure Report dated October 2, 2009, including a list of all encumbrances. The report was obtained by Golson Legal, P.A. on behalf of Immel. Exhibit 23, handwritten accounting notes of Leal, shows Immel advanced two draws on this property totaling $64,025.00 - - the first for $38,700 on April 24, 2008, and the second for $25,325 on August 7, 2008. Leal confirmed Immel invested $64,025.00 in each house on 4th Ave. Leal Depo. at 35:19-22.

[45] Exhibit 21 contains pictures of Parcel A and B showing the unfinished homes and overgrown landscape.

5th SE Avenue, Immel anticipates her loss will be $38,409.27[46] and, thus, that is the amount she is seeking to recover as damages for her investment in the property at Parcel B 0 4th (south 1/2) SE Avenue, Ruskin, Florida.

With respect to property, the Court, under *Mascio*, can only award the difference between the actual value of the property at the time of purchase and its value at that time had the representation been true. The "loss ratio" calculation offered by Immel does not meet this standard. The Court has no evidence of the actual value of the property at the time of Immel's investment, nor of the actual value of the property had Tani's (or Leal's) assertions about the property been true. Therefore, the Court can award no damages regarding this property.

e.    House and mortgage at 518 N. Whitcomb, Ft. Collins, Colorado

On or about July 25, 2008, Immel purchased a home located at 518 North Whitcomb from Mr. and Mrs. Tani for the contract price (set by Tani) of $240,000.00.[47] Immel testified she purchased this home in cash based on Tani's insistance because he would not stop pressuring her into buying it. Immel also testified Tani brought the property up frequently, and told her the 518 N. Whitcomb house suited her better than the house she was then living in at 504 Corbett Drive. Based upon Immel's testimony, at the time Tani recommended she buy the Whitcomb house, she was unaware the Tanis were the owners. It was not until she was presented with the contract that she learned the owners' identity.

When Immel purchased the Whitcomb house, she knew the house was a rental house. She was also aware, based on Tani's representations, approximately $5,000 in repairs were needed. In lieu of a formal inspection, Immel chose to just drive by the

---

[46]   In her Summary, Immel states, "Estimated value or sales price - based on the percentage of the net sale price on the property at 504 B. 5th Avenue, Ruskin, FL. On the 504 B 5th Avenue property, Plaintiff invested $184,757.29, and received a net sales price of $74,126.22 (Exhibit 10), for a loss of $107,701.07, or 58.29 percent of her investment. Assuming the same loss ratio on this property, Plaintiff's reasonably anticipated loss will be $65,894.54 x 58.29, or $38,409.27.00." Summary, p. 4.

[47]   *See* Contract to Buy and Sell Real Estate entered into on May 28, 2008, between Immel (as "Buyer") and Kip and Polly Tani (as "Sellers") for the purchase price of $240,000.00. The "Broker's Acknowledgments and Compensation Disclosure" part of the form contract is blank, indicating neither party was represented by a real estate broker/agent.

house for two reasons.  First, she trusted Tani.  Second, she was tired of Tani pushing her toward buying the house.  Moreover, Immel testified Tani never advised her to inspect the property and did not tell her about any other repairs, other than the $5,000 needed to repair one wall.

Additionally, when Immel purchased the house on July 25, 2008, there was a tenant in place.  Exhibit 33 is a Lease Agreement dated August 1, 2008, between Tami Agne-Moehle aka Tami Agne (as "Lessee") and Immel (as "Lessor") for the period of August 1, 2008 through July 31, 2010 at the rate of $1,350 per month.  The Lessor signature line on the Lease at page 6 is signed  by "Kip Tani for Nancy Immel."  Immel testified she did not authorize Tani to sign a lease on her behalf.

After purchasing the Whitcomb property, Immel inspected the inside of the house and found holes in the kitchen ceiling, damaged cabinetry, damaged outlets, and other damage.[48]   Immel testified the house is still in poor shape, needs a lot of repairs, and the insurance company has indicated it will not continue to insure the house until the roof if repaired and the house is painted.

Immel bases her claim on this house and mortgage on the following items: 1) appraisal fee paid to Managed Investments in the amount of $350.00 (Exhibit 29);[49] 2) loan application fee paid on February 20, 2008, in the amount of $1,700.00 paid by Immel to Coral Bay Properties, LLC (Exhibit 30);[50] 3) purchase price on August 4, 2008, in the amount of $240,000 (Exhibit 31);[51] 4) other closing costs paid on August 4, 2008,

---

[48]  Exhibit 34 contains pictures of the interior of the Whitcomb house.

[49]  Although the check is actually dated "Jan. 2, 2007," Immel's Post-Trial Brief states the appraisal fee was paid on January 2, 2008, and the Wells Fargo information provided in Exhibit 29 indicates the check was processed on February 15, 2008.  The Court believes the check contains an error and should be dated January 2, 2008.  The actual appraisal was not offered or admitted into evidence and it is not clear whether any appraisal was actually conducted.  Immel testified Managed Investments was one of Tani's business entities.

[50]  Exhibit 30 contains a check dated February 20, 2008, written by Immel to Coral Bay Properties for $1,700.00.  Coral Bay Properties was also one of Tani's business entities.

[51]  Exhibit 31 contains a Good Faith Estimate of Closing Costs dated July 1, 2008, provided by Meridian Mortgage Financial Corporation (page 2 identifies Kip Tani is the "broker representative" at the address identified as that of Meridian Mortgage) showing a proposed loan amount of $192,000, total fees, commissions, costs and expenses of $5,141.33, and a purchase price of $240,000.00 for the property at

in the amount of $5,141.33 (Exhibit 31); 5) property insurance for 2008-2009 in the amount of $2,016.00 (Exhibit 35); 6) sewer repairs in 2008 in the amount $1,750.00 (Exhibit 36);[52] 7) interest paid on the mortgage through 2008 in the amount of $3,000.00 (Exhibit 37); 8) interest and escrow paid on the mortgage for 2009 in the amount of $16,507.44 (Exhibit 38); 9) interest and escrow paid on the mortgage for 2010 in the amount of $16,507.44 (Exhibit 38); 10) interest and escrow paid on the mortgage for 2011 in the amount of $16,507.44 (Exhibit 38); and 11) bids for repairs in the amount of $41,194.00 (Exhibit 39).[53]  Based on these eleven items, total expenditures and anticipated expenditures are $344,673.65.

Immel acknowledges certain reductions from this claim must be made for: 1) $1,350.00 in monthly rent received September 2008 to January 2012 in the total amount of $54,000.00 (Exhibits 33 and 40);[54] and 2) the sale price *if* sold to tenant Tami Agne (less expected closing costs of $3,441.00) in the total amount of $215,559.00 (Exhibit 31).[55]  Based on these two items, total reductions are $269,559.00.  Thus, Immel seeks total damages of $75,114.65 for her investment in the house at 518 N. Whitcomb, Ft. Collins, Colorado.

---

518 N. Whitcomb.

[52]  Exhibit 36 is an invoice dated November 11, 2008, from Hilgenberg Excavating, Inc. to Immel for "Dig, repair and backfill water line.  Clean up area." in the amount of $1,750.00.  The invoice contains a handwritten note that the bill was paid on November 14, 2008.

[53]  Exhibit 39 is a "Repairs Estimate"dated July 30, 2010, from Drennen Custom Contracting to Immel showing several categories of repairs to the landscaping and interior and exterior of the house totaling $29,237.00, garage roof totaling $3,190.00, and house roof totaling $11,957, for a grand total of $44,384.  Immel's request for damages in the amount of $41,194.00 appears to exclude the garage roof estimate.

[54]  Exhibit 33 is a Lease Agreement dated August 1, 2008, between Tami Agne-Moehle aka Tami Agne (as "Lessee") and Immel (as "Lessor") for the period of August 1, 2008 through July 31, 2010 at the rate of $1,350 per month.  Exhibit 40 appears to be a partial ledger for Immel's expenses, rent received, payments and income relating to 518 N. Whitcomb.  The lease was apparently extended for several years months (40 months x $1,350 = $54,000).

[55]  In her Post-Trial Brief, Immel directs the Court to Exhibit 31 to support this figure.  However, Exhibit 31 is the Good Faith Estimate of Closing Costs dated July 1, 2008, for the property at 518 N. Whitcomb.

With respect to property, the Court, under *Mascio*, may only award the difference between the actual value of the property at the time of purchase and its value at that time had the representation been true. Here, the Court has Immel's purchase price of the house, $240,000, less Immel's anticipated repairs of $5,000 for value at the time of purchase of $235,000, had Tani's representations about the value of the house and the needed repairs been true. However, although the Court has evidence as to the repair costs paid by Immel, there is no evidence as to what the <u>actual value</u> of the property was <u>at the time of the purchase</u>. The sales price Immel thinks she may be able to receive from the property's tenant is irrelevant. Therefore, the Court can award no damages regarding this property.

> f.   <u>Attorney fees and costs paid to Florida attorneys relating to the two properties at SW 4th Avenue and the two properties at 5th SE Avenue, Ruskin, Florida, $4,884.90.</u>

Immel seeks $4,884.90 in damages based on legal fees she has incurred in employing Florida counsel, Golson Legal, P.A. to handle matters related to the Ruskin, Florida properties, including obtaining the foreclosure reports identified above. Immel directs the Court to Exhibit 62 which is a statement from Golson Legal, PA. Immel testified she paid Golson Legal, P.A. $4,141.00 in legal fees and $743.90 in costs, totaling $4,884.90. Because no damages are awarded with respect to the real property investments, no attorneys' fees will be awarded, but, for the reasons stated below, costs will be allowed.

## D.   Additional Relief Requested in the Form of Treble Damages and Attorney Fees and Costs.

Immel requests treble damages, as well as an award of litigation costs in the amount of $3,551.00 plus attorneys' fees in the amount of $75,208.00.[56] Immel believes her use of Florida and Colorado legal counsel helped to mitigate and reduce the damages sought against Tani and should be granted and made a part of the

---

[56] *See* Immel's *Second Amended Complaint to Determine Dischargeability of Debts*, ¶¶ 34 and 39 (Docket No. 29). *See also Plaintiff's Submission of Written Evidence in Support of the Trial Testimony in Support of an Award of Litigation Costs and Attorneys' Fees Against Defendant Kip Haruki Tani* filed on February 28, 2012 (Docket No. 111). These amounts include the $9,549.00 in costs and attorneys' fees Plaintiff requested on January 31, 2012 in her *Motion For An Award of Attorneys' Fees* regarding the discovery disputes (Docket No. 106).

nondischargeable award against Tani.  She also believes Tani's fraud supports the imposition of treble damages.

As the United States Supreme Court stated:

the text of § 523(a)(2)(A), the meaning of parallel provisions in the statute, the historical pedigree of the fraud exception, and the general policy underlying the exceptions to discharge all support our conclusion that "any debt . . . for money, property, services, or . . . credit, to the extent obtained by" fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor.[57]

However, under the "American Rule," there must be a basis, in contract or statute, for a prevailing party to recover attorneys fees.[58]  Immel bases her request on Colorado's criminal code regarding theft and rights in stolen property, COLO. REV. STAT. § 18-4-405 (the "Theft Statute"), which provides:

All property obtained by theft, robbery, or burglary shall be restored to the owner, and no sale, whether in good faith on the part of the purchaser or not, shall divest the owner of his right to such property.  The owner may maintain an action not only against the taker thereof but also against any person in whose possession he finds the property.  In any such action, the owner may recover two hundred dollars or three times the amount of the actual damages sustained by him, whichever is greater, and may also recover costs of the action and reasonable attorney fees; but monetary damages and attorney fees shall not be recoverable from a good-faith purchaser or good-faith holder of the property.

Chief Judge Howard R. Tallman of this Court has noted the definition of theft to be very broad in Colorado, as evidenced by the language in COLO. REV. STAT. 18-4-403.  "As

---

[57] *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998).

[58] *In re Bertola*, 317 B.R. 95, 99-100 (9th Cir. BAP 2004).

a consequence, the category of crimes to which the treble damages provisions of Colo. Rev. Stat. § 18-4-405 applies is equally broad."[59]

However, a claimant under Colo. Rev. Stat. § 18-4-405 must prove all of the elements of the Theft Statute, including the requisite intent.[60]  The Colorado Supreme Court has further explained:

In the context of theft of construction project trust funds, the "knowingly using" element of mental culpability in subsection 18-4-401(1)(b) does not require a conscious objective to deprive another person of the use or benefit of the construction trust funds, but instead requires the offender to be aware that his manner of using trust funds is practically certain to result in depriving another person of the use or benefit of the funds.[61]

Courts within this Circuit have differed on what is required to make a finding of theft and impose treble damages under Colo. Rev. Stat. § 18-4-405.  This Court is most familiar with the issue in connection with Colorado's Trust Fund Statute.  United States District Court Judge Robin J. Cauthron held once a violation of Colorado's Trust Fund Statute is established, that finding also establishes the contractor committed theft with intent.  On that point, Judge Cauthron stated:

The jury's verdict establishes [defendant] violated subsections (1) and (2) of § 38-22-127. Thus, the verdict establishes that [defendant] committed theft with intent. *See* § 18-4-401(1)(a): "(1) A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and: (a) Intends to deprive the other person permanently of the use or benefit of the thing of value. . . ." Once these acts are established, the [plaintiff] is entitled to the benefits of § 18-4-405, which includes treble damages. To the extent the court in Barnes held that an additional showing of criminal conduct is required, the Court finds no statutory support for this holding. Even were a finding of criminal

---

[59] *In re Krupka*, 317 B.R. 432, 437 (Bankr. D. Colo. 2004).

[60] *People v. Mendro*, 731 P.2d 704, 706-07 (Colo.1987), *accord People v. Erickson*, 695 P.2d 804, 805 (Colo. App.1984).  *See also In re Barnes*, 377 B.R. 289, 301 (Bankr. D. Colo. 2007).

[61] *People v. Anderson*, 773 P.2d 542, 545 (Colo. 1989).

conduct, required, § 18-4-401 clearly imposes criminal intent on a person violating the statute. As noted above, [defendant's] violation was established by the jury's verdict on § 38-22-127.

The only question remaining then is whether the trebling is discretionary with the Court. Although the statute uses the word "may," that word is in reference to the ability of the owner to recover damages, not as a grant of discretion to the Court on whether or not to award treble damages. *See In re Krupka*, 317 B.R. 432 (Bankr. D. Co. 2004). Clearly, trebling is required upon satisfaction of the statutory elements of the trust fund statutes.[62]

Similarly, United States District Court Judge Walker D. Miller held while an award of treble damages is not discretionary, the plaintiff must still prove the intent element of theft and that there was a violation of the Trust Fund Statute:

[T]he treble damages award under the TFS must be based on the definition of theft as contained in the theft statute, COLO. REV. STAT. § 18-4-401, which requires a showing of intent. Such a limitation on the imposition of treble damages ensures that only those who act intentionally are subjected to the harsh punishment of treble damages.[63]

With respect to all of the loans and investments at issue, Tani testified he never wanted relief from his indebtedness to Immel, and wanted to pay the money back. But he had not anticipated the economic recession. He understood the Bankruptcy Code required him to list all debts in his schedules.

The Court finds, however, after reviewing all the evidence, Tani's testimony lacks credibility. The intent necessary for imposition of treble damages and attorneys fees is evident in this case through Tani's conduct. Tani knowingly made numerous false statements and material omissions in order to perpetrate his scheme to take advantage of Immel. Based on these findings, specifically in connection with § 523(a)(2)(A) and (4), the Court finds Immel has shown Tani possessed the requisite intent to

---

[62] *Parker Excavating, Inc. v. Parker*, 2010 WL 1258034, at *2-3 (D. Colo. March 24, 2010) (Slip Copy). Judge Robin J. Cauthron of the U.S. District Court for the Western District of Oklahoma issued the opinion in this District of Colorado case.

[63] *McCarty v. Powell (In re Powell)*, 2008 WL 4489179, at *4 (D. Colo. 2008).

permanently deprive her of the money loaned.  Therefore, Immel is entitled to three times the amount of her actual damages regarding the loans, pursuant to COLO. REV. STAT. § 18-4-405.

Moreover, the Court will award reasonable attorneys' fees and costs to Mr. McKnight for his work regarding the loan transactions, but not the real property transactions.  The Court made a detailed review of Mr. McKnight's fee statement, filed February 28, 2012.  The Court reviewed Exhibits 1 through 11 attached to that statement, consisting of Mr. McKnight's invoices with itemized time entries, and deleted those entries pertaining to the real property transactions.  The Court evaluated the remaining fees, and finds they are reasonable.  The Court will therefore award Mr. McKnight $47,447.50 in attorneys' fees.  In addition, pursuant to COLO. REV. STAT. § 18-4-405 and FED. R. BANKR. P. 7054(b), discussed below, the Court will award Mr. McKnight his requested $3,551.00 in litigation costs, for a total of $50,998,50.

Although there is no bankruptcy statute or rule specifically providing for attorney fees and treble damages in the context of § 523(a)(2) and (4), and although the Court finds the Theft Statute does not allow the award of attorney fees regarding the real property transactions,  FED. R. BANKR. P. 7054(b) does provide for costs.[64]  Accordingly, the Court allows Immel's costs in the amount of $742.90 for litigation costs incurred by Golson Legal, P.A. regarding the real property transactions.

---

[64] FED. R. BANKR. P. 7054(b) states:

The court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides.  Costs against the United States, its officers and agencies shall be imposed only to the extent permitted by law.  Costs may be taxed by the clerk on one day's notice; on motion served within five days thereafter, the action of the clerk may be reviewed by the court.

| Summary of Damages Requested and Allowed | | |
|---|---|---|
| <u>Loans</u> | <u>Requested by Immel</u> | <u>Allowed by Court</u> |
| Loan to Kip Tani d/b/a ReefWare | $8,000.00 | $8,000.00 allowed |
| Loan to Kip Tani d/b/a Coral Bay Properties, LLC | $16,862.28 | $16,862.28 allowed |
| Loan to Pam Stoney | $7,000.00 | $7,000.00 allowed |
| Loan to Mark Pugh | $1,839.00 | $1,839.00 allowed |
| Mortgage on 504 Corbett Drive, Fort Collins, CO | $37,735.47 | $37,735.47 allowed |
| <u>Real Property Investments</u> | <u>Requested by Immel</u> | <u>Allowed by Court</u> |
| House at 504 B 5th SE Avenue, Ruskin, FL | $107,701.07 | not allowed |
| House at 504 A 5th SE Avenue, Ruskin, FL | $29,145.00 | not allowed |
| Property at Parcel A 0 4th (North    ) SE Avenue, Ruskin, FL | $38,409.27 | not allowed |
| Property at Parcel B 0 4th (south    ) SE Avenue, Ruskin, FL | $38,409.27 | not allowed |
| Attorney fees and costs paid to Florida attorneys relating to the two properties at SW 4th Avenue and the two properties at 5th SE Avenue, Ruskin, FL (Exhibit 62) | $4,884.90 | $742.90 in costs allowed, but not added until after the damages total (see below) |
| House and mortgage at 518 N. Whitcomb, Ft. Collins, CO | $75,114.65 | not allowed |

| Totals | Requested by Immel | Allowed by Court |
|---|---|---|
| SubTotal: | $365,100.91 | $71,436.75 |
| Total (with interest at Colorado legal rate of 8%): | $435,545.82 | $93,029.66 (interest at the Colorado legal rate of 8%, compounded annually, through May 30, 2012) |
| Plus punitive damages pursuant to Colo. Rev. Stat. § 18-04-405. | Treble damages ($1,306,637.46) | Treble damages of $279,088.98 |
| Plus Immel's attorney fees and costs to Robert McKnight (Bill of Costs filed 2/28/2012: $3,551.00 in litigation costs and $75,208.00 in attorneys' fees) | $78,759.00 | $50,998.50 in fees and costs allowed |
| Costs paid to Florida attorneys | $742.90 | $742.90 |
| Grand Total | $1,385,396.46 | $330,830.38 |

## CONCLUSION

For all of the foregoing reasons,

IT IS ORDERED final nondischargeable judgment against Kip Haruki Tani as to liability under §  523(a)(2) and (4) shall enter in the amount of $330,830.38.

Dated June 8, 2012                                   BY THE COURT:

_____
Michael E. Romero
United States Bankruptcy Judge